Filed 03/16/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| M.G. et al.,<br><br>        Petitioners,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>        Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | G058611<br><br>(Super. Ct. Nos. 16DP1328,<br> 16DP1329)<br><br>O P I N I O N |

        Original proceedings; petitions for a writ of mandate to challenge an order of the Superior Court of Orange County, Caryl Lee, Judge.  (Retired Judge of the Orange Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Petitions granted.

        Donna Chirco and Peggy Oppedahl for Petitioner M.G.

        Vincent Uberti for Petitioner A.G.

        Clyde & Co and Douglas J. Collodel for Respondent Superior Court of Orange County.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Real Party in Interest.

Patricia Smeets Rossmeisl for Minors.

*        *        *

M.G. (Mother) and A.G. (Father) both petition for an extraordinary writ (Cal. Rules of Court, rule 8.452) in the dependency cases of their children, A.G. and C.G. They challenge the juvenile court's order after a contested 18-month review hearing. The court terminated family reunification services for Mother and Father and set a Welfare and Institutions Code section 366.26[1] hearing (.26 hearing) for March 19, 2020. Mother and Father assert the court erred by setting the .26 hearing because there was an insufficient evidentiary showing the children would be at risk in their care. We agree with the parents that Orange County Social Services Agency (SSA) failed to present sufficient evidence the children would be at risk if returned to their parents. We therefore grant the petitions.

FACTS

*I. Pre-Detention and Detention*

On December 6, 2016, SSA requested a protective custody warrant for A.G. (seven years old) and C.G. (five years old), alleging the children were at risk of abuse or neglect because Father was incarcerated and Mother was using drugs, was homeless, and had exposed the children to domestic violence with her boyfriend, P.B. On December 7, 2016, the juvenile court granted the protective custody warrant and the children were placed with their maternal aunt (Aunt).

SSA filed a juvenile dependency petition on December 9, 2016. The petition alleged the following facts: Mother had an unresolved substance abuse problem with methamphetamine; Mother had a history of domestic violence with Father and P.B.;

---

[1]      All further statutory references are to the Welfare and Institutions Code.

2

A.G. reported witnessing domestic violence between Mother and P.B.; Mother was not meeting the children's medical needs; Father had a criminal history including offenses relating to substance abuse and domestic violence; Father was incarcerated; and Father had other children who had previously been removed from him, although eventually returned to his care.

At the December 12, 2016, detention hearing, the juvenile court detained the children from Father and Mother. The children remained with Aunt. The court ordered Mother six hours of weekly monitored visitation with the children and telephone calls on nonvisitation days. The court authorized monitored telephone calls with Father.

## II. *Jurisdiction and Disposition*

SSA interviewed both parents regarding the allegations contained in the petition. Mother initially denied domestic violence in the presence of the children. Mother later stated that domestic violence with Father did indeed happen in the presence of the children, but she refused to provide details. She denied neglecting the children's medical needs. She otherwise confirmed the allegations. Father did not have knowledge regarding many of the allegations due to his incarceration.

At the January 31, 2017, jurisdictional hearing, the juvenile court sustained the petitions and declared the children dependents of the court pursuant to sections 300, subdivisions (b), (g), and (j). The court determined returning custody to the parents would be detrimental to the children and vested custody with SSA. The court ordered reunification services and visitation for both parents.

## III. *Six-Month Review Period*

In the May 2017 interim report before the six-month review hearing, SSA stated Mother visited with the children three times per week. Father was released from custody and visitation was being arranged for him. SSA stated, due to the children's schedules, "[v]isitation with their [F]ather may have to be arranged during the same visitation hours as their [M]other."

The July 2017 six-month review hearing report noted Mother filed a restraining order against P.B., based on an incident of domestic violence. Aunt expressed concern that P.B. was still driving Mother to and from her visits with the children. Mother denied P.B. violated the restraining order.

Mother told the senior social worker assigned to the case, Janet Ford, that she did not want to share her visitation time with Father as she did not want to talk about their relationship or about being a couple. Ford reported Mother then said shared visitation was "okay." Ford reported visitations with both parents were going well. The children enjoyed eating, playing, watching movies, and making things with their parents.

Mother reported she was working full time at a factory job. Mother completed a parent education program, but had not yet enrolled in counseling. Mother claimed she did not receive any information regarding counseling. Ford re-referred Mother for counseling and got her placed on a waitlist for services.

Mother was continuing in her drug treatment program and testing clean. Father also tested clean.

The court determined Mother and Father had both made moderate progress toward "alleviating or mitigating the causes necessitating placement." It ordered additional family reunification services to the 12-month review. The court ordered the parents' visits to be separate.

IV. *12-Month Review Period*

The 12-month review hearing report largely reported the parents' progress. Mother was attending a personal empowerment program (PEP program). The PEP program reported Mother had good attendance, however, the therapist reported concerns Mother was with P.B. Specific concerns included, "[t]he provider is not 100% sure the mother will practice the skills learned" and Mother "could go backward with the involvement with [P.B.]." The PEP program therapist also noted Mother "wants to be with her children; she is a great, a good mother, does her visits and is happy with them."

4

Mother attended therapy without missing any sessions. Her therapist reported she was insightful regarding her thoughts and feelings and how it affected her behavior. Mother could recognize and manage stress. Mother was motivated not to return to her previous lifestyle and to focus on the children. Mother told her therapist she "wants her children first, and no relationship with [P.B.] if necessary." She discussed the restraining order with P.B. and the importance of boundaries with her therapist.

Mother completed a parenting course, tested clean, and attended Narcotics Anonymous meetings. She also completed outpatient substance abuse treatment.

Mother continued to have positive visits with the children. Staff reported no concerns with Mother's visits, stating she was "'very involved'" and "active" with the children. Staff at the visitation center denied Mother used her cell phone during visits or did anything else that distracted from visits, as suggested by Aunt. Mother started visits at the mall, supervised by her friend, Tish. The Aunt reported P.B. was present at the visit however, Tish and Mother denied that was true. However, the children reported P.B. was at the mall for about 10 minutes. This was relevant because two restraining orders were in effect during the 12-month review period. One was between Mother and Father allowing Father peaceful contact with the children. The other one was between P.B. and Mother.

As for Father, his case plan included counseling, parent education, substance testing, a 12-step treatment program, and out-patient substance abuse treatment. Father consistently attended, even arriving early, for a Child Abuse and Batterer's Intervention program twice a week and therapy once a week. His therapist reported no concerns.

Father tested clean with the exception of two diluted tests. Father reported he drinks too much water at work, which causes the diluted tests. He continued to attend Alcoholics Anonymous meetings and resided at a sober living house.

Ultimately, for the 12-month review hearing report, Ford characterized Mother and Father's progress as "moderate." Mother completed parenting, counseling, and perinatal programs. She had one more class in her PEP program, continued to drug test with negative results, attended her 12-step group meetings, and expressed her intent to continue with an optional aftercare perinatal program for on-going support. Mother had no issues with her visitation. Father maintained consistent visitation with the children, continued counseling and parenting programs, and attended his Child Abuse and Batterer's Intervention program. He tested clean except for the two diluted tests.

SSA recommended the children remain in their placement for the parents to secure stable housing. The juvenile court ordered further family reunification services for the parents and set an 18-month permanency review hearing.

After the 12-month review hearing, SSA filed a request to allow the parents to visit the children together after the restraining order expired. This was to allow the children to attend other activities. The request was agreed upon by all parties and ordered by the court.

*V. 18-Month Review Period*

The juvenile court initially set the 18-month review hearing for June 11, 2018. After many continuances, however, the hearing began on June 6, 2019, nearly 30 months after the children were initially removed.[2] However, the court declared a mistrial on September 19, 2019. A new 18-month review hearing began on October 28, 2019, 34 months after initial removal.[3]

---

[2] The section 366.22 hearing must be held within 18 months of the initial removal of the child from the parent or guardian's custody. (§ 366.22; Cal. Rules of Court, rule 5.720.) "Initial removal" is defined as the date on which the child was taken into custody by the social worker or deemed taken into custody when put under a hospital hold pursuant to section 309, subdivision (b). (Cal. Rules of Court, rule 5.502(21).)

[3] The various delays were caused by all parties and the juvenile court. The court continued the case at least nine times because it was engaged in another matter.

6

In the initial 18-month review hearing report, SSA recommended termination of reunification services to the parents. Mother was in the process of securing housing and according to her, was still employed. Mother's restraining order against P.B. was modified to allow peaceful contact and Mother planned on moving in with P.B. when she got her new apartment. Mother completed the PEP program and awaited a counseling referral. She continued to test negative for drugs and also continued to attend 12-step meetings.

Mother's visits with the children remained consistent. On May 29, 2018, Mother called the police after the children's baseball game. Father reportedly threatened that he was going to get the children back and leave for Mexico and Mother would never see them again. As a result of the police being called, Ford ordered Mother's and Father's visits separate and supervised. In addition, the Aunt reported seeing P.B. in the vicinity of some of the visits.

Ford, described Mother's prognosis for reunification as "poor," stating: "[M]other's visitation, though consistent, has not progressed from supervised status as she has not yet re-started counseling services needed to gage her commitment with making changes to provide safety for the children. Further, the [M]other appears to have secured housing and stated she plans to have [P.B.] reside with her. An adult male was observed to be in her apartment . . . [M]other has a reported history of domestic violence with [P.B.] whom the [M]other has a current restraining order on with [p]eaceful [c]ontact modifications."

---

The other continuances occurred when Father's counsel was unavailable, Mother obtained new counsel, and when the parties stipulated to trail the matter. Additionally, more than two and one-half years into the case, minors' counsel declared a conflict of interest as to the children. Further delay ensued due to the appointment of new counsel for minors. Father moved for, and was granted, a mistrial during the first 18-month review hearing. A hearing taking place 34 months after initial removal is inexcusable.

Father continued to attend his substance abuse treatment and Child Abuse and Batterer's Intervention programs. He complied with all of the program requirements for his services. In April 2018, the director from Father's sober living recovery program rated him an "A+" with no problems in the program. Ford described Father's "[p]rognosis for reunification" as "good [he] has progressed with services."

Due to the numerous continuances of the 18-month review hearing, SSA filed several addendum reports.[4] We state only the portions relevant to this appeal. SSA's addendum report stated Father's visits returned to unsupervised in June 2018. In August 2018, Mother reported P.B. no longer lived with her as he had pushed her twice the previous night. Mother informed the police and changed the locks. Mother began overnight visitation with the children in October 2018.

In October 2018, Mother came to one of Father's visits at a restaurant after being invited by Father. Mother admitted she and Father had been visiting the children together for the past month. Mother was told she was not authorized to visit with Father other than at the children's baseball games.

In November 2018, Ford made an unannounced visit to Mother's home during her visitation. Ford observed Mother walk a man out of the home that she said was her adult son's boyfriend. Mother's adult son was preliminarily cleared as a roommate. The children reported P.B. was present at a visit at the end of November and he stayed overnight. C.G. stated he did not want the judge to end the visits with his mom. Mother's visitation was changed to monitored.

The review hearing was continued again multiple times. In the interim, Father's visits were extended to overnight. In February 2019, he began weekend visits.

---

[4] We note, with concern, the juvenile court appeared to not have reviewed all of the SSA reports in making its decision to set the .26 hearing, it stated: "We do have a world's record number of reports that were received. [¶] This court, unfortunately, did not have the benefit of about 90 percent of those."

8

Father's visits were temporarily restricted back to supervised in February of 2019 due to a positive drug test. The restriction was lifted in early March 2019. Father reported taking a variety of over-the-counter and prescribed medication to address a variety of symptoms he was experiencing at the time. Father reported he consumed a poppy seed muffin the day he tested positive and suspected that the muffin may account for the positive test. Ford received information from the testing lab indicating that consumption of poppy seeds could explain the positive test. Ford did not see any signs or symptoms of substance abuse. Father's next test was negative.

In March 2019, the court authorized a trial release of the children with Father. Both parents expressed concern about Aunt and her interference with the case as she wanted to adopt the children.

In April 2019, Father tried to pick up C.G. at the park during Mother's visitation to take him to a pizza party. Mother called the police. Father waited at the park and spoke with the police. Mother reported Father grabbed C.G. by the arm when trying to take him to the pizza party. Father's trial visit was ended, but his visits remained unmonitored in a public setting.

Mother asked for two visits in June 2019, for a baseball game and Disneyland. Mother suggested an approved monitor who would attend. Mother asked Ford to allow Father to attend the Disneyland visit to celebrate A.G.'s birthday. Father also requested the Disneyland visit. Ford denied the request, but the court granted it. The parties brought to the court's attention concerns the parents would not follow the court order regarding the Disneyland trip. The court then vacated the order for the shared Disneyland trip. Subsequently, the court ordered Father's visits supervised.

Mother continued to test negative for illegal substances. Mother's therapist reported she was "very engaged." In August 2019, the therapist reported she was able to process with Mother her decision to let P.B. stay the night during her visitation and Mother realized it was a mistake. The therapist reported no concerns with unmonitored

9

visits for Mother. In July 2019, Mother reported P.B. was not living with her and had not lived with her for the past eight months as he was in a recovery program.

*VI. Children's Testimony*

A.G. testified he would want to live with Father but also visit Mother and Aunt. He felt safe when he lived with Father. A.G. testified the most important person in his life was his brother, C.G. Aunt told A.G. to say he wanted only one day of visits with Mother. It made him sad Aunt asked him to say that. Aunt also told A.G. that if he lived with Mother or Father he could not go on the family trip to Hawaii.

C.G. testified he wanted to live with "my dad or my mom or my aunt." However, he did not want to be adopted by Aunt. In the alternative, C.G. suggested one week with each adult. C.G. also stated P.B. did not attend current visits with Mother. Aunt told C.G. to tell Ford he wanted to stay with Aunt. C.G. told Ford that he wanted to stay with Aunt, even though it was not true, and he felt bad about lying.

*VII. Ford's Testimony*

Ford testified the primary reason she did not recommend returning the children to either parent was due to their "conflictual" relationship. She testified the parents got along well when there was a set visitation schedule in place. When asked, "why did you not then keep a set schedule, regardless of the children's activities, if it meant the parents would get along better," she responded, "I'm not sure." Ford also stated that while she believed it would be beneficial for the parents to have as little interaction as possible, she never "specifically talked about them having less interaction overall."

As for Father, Ford had no concerns with him aside from his interactions with Mother. She also stated "Father was appropriate with the children and was consistent, on time" in his visitation.

Ford testified Mother's visits with the children were "very appropriate." Ford articulated her main concern with Mother was her "inability to have healthy

10

relationships and establish boundaries with her partners, putting her kids at risk." No specific risk was identified. Ford based Mother's risk to the children on the speculation that "she eventually could get into another relationship . . . she would continue to have blurred boundaries such that it would take away from the focus of her children." This opinion was based solely on Mother's history with Father and P.B.

*VIII.  Mother's Testimony*

Mother testified she had been sober for nearly three years. Mother continued to participate in the 12-step program and attended daily meetings.

As for her interactions with Father, Mother stated she learned to walk away from Father when she got frustrated. One time at A.G.'s baseball game, Father told Mother he was going to keep her from seeing the children again. Mother moved away from the situation and called the police after everyone left, so the children would not see the police. Mother testified there had been no physical violence between her and Father for three years.

At the beginning of the case, Ford gave Mother the impression she needed to co-parent with Father. Mother told Ford co-parenting with Father was "too much" and "draining emotionally." It was Ford's idea to modify the restraining order so the parents could visit together. Two months before the trial, Ford told Mother it was better if she and Father had no communication. Mother testified she did not think that was a healthy approach for either parent or the children. Mother wanted independent parenting, with two households, different rules, and different structures. Mother described this arrangement would include visitation exchanges at a police station or park. Mother further testified she could use a parent portal to communicate with Father.

As for her relationship with P.B., Mother testified she was in contact and had a friendship with P.B. P.B. was in the Salvation Army rehabilitation program for six months, and Mother provided moral support for his recovery. Mother stated she had no plans to get back together with P.B. after he finished the program.

11

Finally, Mother testified she wanted the children returned to her care. Mother stated she now sets boundaries with herself, P.B., and Father. Mother testified she was not perfect but she was using the tools she had learned through her services and working on herself. She also said, "my children come first before anything else."

*IX. Mother's Therapist's Testimony*

Mother's therapist testified she told Ford she had no concerns with Mother having unmonitored contact with the children. This was based on Mother's efforts in therapy, progress with her 12-step addiction recovery program, and "willingness to come in and . . . be honest and vulnerable." The therapist further stated it was her impression Mother was not a "risk for her children's safety" and that "in comparison with all the other clients [she had] worked with" she did not "have the concerns [with Mother she] had with other clients." The therapist testified she had no issue with Mother's continued contact with P.B. As to the supposed cycle of domestic violence between Mother and Father, the therapist described it as less of a cycle and that "it could be two people that . . . need to improve their relationship skills and communication skills, and anger management skills." The termination report at the end of therapy indicated Mother had achieved every goal set out.

The therapist also said it was difficult to communicate with Ford, "she had very unusual, long conversation[s] with me that seem[ed] to repeat . . . [¶] [S]he seemed very focused on the cycle of domestic violence and patterns versus more detail as to what the client was reporting . . . [¶] It was very unusual. Compared to all the other social workers that I dealt with, and the other therapists had similar interactions [with Ford]."

*X. Father's Testimony*

Father testified he had no concerns if the children were placed with Mother. Mother and Father's disagreements were around Mother wanting to co-parent. When they got mad at each other they just stopped talking. Father testified Ford deferred to Aunt regarding visitation schedules.

12

*XI. The Court's Ruling*

The court concluded by a preponderance of the evidence return of the children would create a substantial risk of detriment. The court determined the parents were offered reasonable reunification services. The court did not have any concerns about Mother's substance abuse. The court's concern was with Mother's relationship with P.B. and the parents' relationship.

As for Mother's relationship with P.B., the court stated as follows: "So what concerns the court, and this is in connection with the therapist's testimony as well, it's difficult to reconcile how one could have a rather significant emotional, physical, intimate relationship with someone, [P.B.] . . . and then have [P.B.] exit the picture . . . ." The court noted Mother told her therapist the relationship with P.B. was over, and he was in a sober living program, but the court continued, "they have telephone contact one to two times per week, and they were in a friendship." The court characterized Mother and P.B.'s friendship as "a real problem" and opined, "I realize that [Mother's behavior with P.B.] was in the past, but that is a judgment issue and a boundary issue. . . . That is a concern for me, that you maintain contact with [P.B.] who has no place in your life unless somehow you believe he is and you're maintaining that as more than a friendship or even a friendship. That's a boundary issue." The court told Mother, "the [P.B.] thing, you need to re-think that, because that's a risk to you and your sobriety."

The juvenile court stated, "With respect to Father, I do agree that there is an issue with respect to insight. I know that he has gained some. There was some indication that he did take some responsibility and ownership for some of these events." It continued, "I don't know what causes it, but I do see that persistence in parents continuing to linger in this relationship . . . ." The court agreed the parents had made progress, but stated, "The insight is questionable." It went on, "It's a difficult case for me. It wasn't easy because you guys did make some progress. I'm pleased that we don't have substance abuse to get in the middle . . . ."

13

Ultimately, the court terminated the parents' reunification services and set the matter for a .26 hearing—39 months after initial removal—to determine a more permanent plan for the children.

## DISCUSSION

As an initial matter, we see no basis for the lengthy delay in this case. We publish to stress every effort should be made to avoid continuances and to emphasize the important nature of dependency proceedings and their precedence over other court matters. (See § 345.) The statute is clear. The 18-month review hearing must take place within 18 months after the date the child was initially removed from his or her parents. (§ 366.22; Cal. Rules of Court, rule 5.720.) Here, the children were removed on December 12, 2016. The juvenile court conducted the initial 18-month review hearing on June 6, 2019, nearly 30 months past the removal date. While we sympathize with the court's need to balance timely resolution of cases with staffing needs, budgets, and other administrative issues, such lengthy delays in dependency cases runs contrary to the intent of providing children with permanency. Simply put, children deserve the timely resolution the statute mandates.

Turning to the merits of the case, Mother and Father contend the juvenile court erred by setting the .26 hearing. We agree.

We begin by recognizing the underlying policy goal in dependency proceedings: "'Family preservation . . . is the first priority when child dependency proceedings are commenced. [Citation.]'" (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472.) At the 18-month review hearing, there must be a preponderance of evidence for the court to find it would be detrimental to return the children to the parents or the juvenile court must order their return. (§ 366.22, subd. (a).) This burden is squarely on SSA, not the parents. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308 (*Marilyn H.*).) We review the court's determination for substantial evidence. (*Zacharia D.* (1993) 6 Cal.4th 435, 456.)

14

"Under the current dependency scheme, except in limited circumstances, a parent is entitled to 12 months of reunification services, with a possibility of 6 additional months, when a child is removed from a parent's custody. (§ 361.5.) The juvenile court must review the case at least once every six months. (§ 366.) At the dispositional hearing, and at each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody. At the dispositional hearing, the burden is on the state to prove, by clear and convincing evidence, that removal of the child from the parent's custody is necessary. At 6–, 12–, and 18–month review hearings the juvenile court must return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being. (§§ 361, subd. (b), 366.21, subds. (e) & (f), 366.22, subd. (a).) At the review hearings the state must also present evidence that reasonable reunification services have been provided to the parent. (*Ibid*.) If the child may not safely be returned to the parents within a maximum of 18 months from removal, the court must develop a permanent plan for the child. Prior to terminating reunification services, the court must make a determination that it would be detrimental to the child to be returned to the parent's custody. (§§ 366.21, subd. (f), 366.22, subd. (a).)" (*Marilyn H.*, *supra*, 5 Cal.4th at p. 308.)

Under this standard, SSA needed to establish releasing the children to Mother's or Father's custody would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).) That standard is construed as a fairly high one. (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) It does not mean the parent in question is less than ideal, did not benefit from reunification services as much as one we might have hoped, or seemed less capable than the available foster parent or other family member. (*Ibid*.)

15

"In deciding whether it would be detrimental to return a child, the easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan . . . for example, a mother continued to test positive for illegal drug use, continued to move from place to place, failed to 'regularly' attend therapy, and failed to complete her parenting class. This was obviously enough to support a finding of detriment. [¶] The harder cases are . . . where the parent *has* complied with the service plan, but for some reason has not convinced a psychologist or social worker that it would be safe to return the child to the parent. The problem is not, as it were, quantitative (that is, showing up for counseling or therapy or parenting classes, or what have you) but qualitative (that is, whether the counseling, therapy or parenting classes are doing any good). These are sensitive cases, fraught with emotional overtones, because they invariably deal with an evaluation of the *personality, character and attitudes* of the parent." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748, fn. omitted (*Blanca P.*).)

In *Blanca P.*, four siblings were made dependents of the juvenile court and eventually placed in foster care based on an initial petition charging excessive corporal punishment by their mother. (*Blanca P.*, *supra*, 45 Cal.App.4th at p. 1742.) A different panel of this court issued a writ vacating the juvenile court's finding of detriment. (*Id.* at pp. 1759-1760.) The evidence of mother's supposed risk to the children was as follows: "We have no clinical evaluation, no testing to indicate mental illness, just the opinion of the mother's social worker and a therapist that she has not 'internalized' what she has learned in parenting classes. [¶] This failure to 'internalize,' moreover, is seen largely by the social worker and therapist as the result of [mother's] refusal to believe her husband is a child molester. When we look at just the subject of excessive corporal punishment, interestingly enough, the evidence is undisputed that [mother] has said she has learned that she should not use excessive force in child discipline. Indeed, her comments as related (but not believed) by the social worker are that she is willing to forswear corporal

punishment altogether. Thus apart from the molestation [which the court discussed and remanded for a finding on] the case against [mother] boils down to the fuzzy notion that she does not truly believe what she has been taught about child discipline—a subject about which there is controversy even among experts and which is hard enough for *any* parent to master. [¶] Let us be plain. The idea that, despite enduring countless hours of therapy and counseling (much of it predicated on the possibly erroneous assumption that her husband is a child molester), a parent who has faithfully attended required counseling and therapy sessions must still relinquish her child because she has not quite 'internalized' what she has been exposed to has an offensive, Orwellian odor. The failure to 'internalize' general parenting skills is simply too vague to constitute substantial, credible evidence of detriment. To hold otherwise would come perilously close to allowing legal decisions of monumental importance to the persons involved to be based on nebulous ideas more appropriate to an afternoon talk show than a court of law. [Citations.]" (*Id*. at p. 1751.)

Here, substantial evidence does not support the juvenile court's finding of detriment. SSA failed to articulate specific reasons why or how the children would be at risk if placed in Mother's or Father's care. The juvenile court's ruling relied on SSA's vague and nebulous concerns that were not supported by evidence. The court stated it had no concerns with the parents' substance abuse. It focused on Mother's relationship with P.B., even though Mother testified she was merely friends with P.B., and her therapist testified she had no concerns about Mother's relationship with P.B. SSA produced no evidence contradicting that evidence. In short, the court based its concerns on a hunch that was not supported by any evidence, stating Mother's relationship with P.B. was "a risk to you and your sobriety." Furthermore, this contradicted the court's determination Mother's sobriety was no longer an issue.

The juvenile court stated Father had "an issue with respect to insight," but did not state what evidence supported this characterization. Similarly, as to the

17

relationship between Mother and Father, the court noted they continued to "linger in the relationship" and "[t]he insight is questionable." There was no evidence Mother and Father maintained their relationship. What forced Mother and Father to interact was confusing and inconsistent mandates from Ford about co-parenting.

What the evidence did show, however, was Mother and Father both participated in and made substantive progress on their service plans. Indeed, we commend Mother and Father for working through their substance abuse issues. Sadly, it is not often we have a case like this where not one, but both parents, get clean and sober. We are also impressed by the parents' commitment to their children. While balancing many other obligations, both Mother and Father showed up, usually early, for their visits with the children.

Ford's opinion, which the juvenile court apparently credited, that Mother and Father had not resolved their issues regarding domestic violence is perplexing given the parents' full participation in their service plans. Ford testified her concern was the parents' interactions continued. This is confusing, as the record demonstrates Ford encouraged the parents to continue interacting and co-parenting for almost the entire case. Indeed, it was Ford's idea to modify the restraining order so the parents could visit together. Then, just two months before trial, Ford told Mother it was better if she and Father had no communication. Ford testified the parents got along well when there was a set visitation schedule in place. She also admitted she did not keep a set schedule in place. Ford believed it would be beneficial for the parents to have as little interaction as possible, but conceded she never "specifically talked about them having less interaction overall."

Mother's therapist indicated Mother had achieved every therapy goal set out. The therapist testified she had no concerns with Mother having unmonitored contact with the children. The therapist testified she had no issue with Mother's continued contact with P.B. The therapist described the supposed cycle of domestic violence

18

between Mother and Father, as less of a cycle and that "[i]t could be two people that . . . need to improve their relationship skills and communication skills, and anger management skills."

Tellingly, the therapist also testified about problems with Ford. The therapist stated it was difficult to communicate with Ford, "she had very unusual, long conversation[s] with me that seem[ed] to repeat . . . [¶] [S]he seemed very focused on the cycle of domestic violence and patterns versus more detail as to what the client was reporting . . . [¶] It was very unusual. Compared to all the other social workers that I dealt with, and the other therapists had similar interactions [with Ford]."

We are puzzled and dismayed by the juvenile court's willingness to accept Ford's testimony based on a theoretical and speculative future cycle of violence involving Mother. Simply put, there was no evidence, much less substantial, of any risk or detriment to the children. For some reason not clear in the record, Ford refused to credit Mother's progress in her service plan, and instead blamed her for both parents' inability to get along. This was both inappropriate and contrary to the entire purpose of the dependency system. Indeed, if these parents, who got clean and sober, attended and completed all of their services, and had overall positive visitation with the children, could not get their children back at the 18-month review hearing, we are at a loss to see what parent could. We remind the court of the statutory preference towards parental reunification. We reiterate our displeasure at the duration of this case and Ford's reports and testimony minimizing and ignoring the parents' progress towards reunification. Mother, Father, and the children all deserved better.

We will therefore grant the petitions to vacate the order made at the 18-month review hearing, but not order the immediate return of the children. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 701. "[A]lthough we reverse the trial court's dispositional order, this does not necessarily mean that the trial court must now permit appellant to take custody of [the child]. . . . Rather, because we lack information as to

19

any court orders or factual developments that may have intervened since the entry of the dispositional order . . . and cannot speculate as to their possible effect on the current situation . . . we leave it to the . . . discretion of the trial court to determine what procedural steps, and what result, are appropriate at this juncture in light of our reversal . . . ." (*Ibid*.)  A continued 18-month review hearing must be held, which will focus on any developments in the case since the previous hearing and the reasons articulated in this opinion.

## DISPOSITION

The petitions for extraordinary writ are granted.  Let a peremptory writ of mandate issue directing the juvenile court to (1) vacate its order setting a hearing under section 366.26 and (2) set a continued 18-month review hearing.  The hearing shall be held as soon as possible, consistent with the right of all sides to prepare their case.

For the guidance of the juvenile court, we elaborate on the steps that should be taken at the new hearing.  If, at the continued 18-month review hearing, there are no new developments that would warrant otherwise, the children should be returned to their parents.  Barring such developments, there is no support for a detriment finding.  If the court does find that new developments warrant a different conclusion, the court can make whatever orders are appropriate in light of that finding and then address any other issues raised by the parties.  In the interests of justice, this decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

O'LEARY, P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.